Russell A. Bigelow v. R. T. Wilson, Appellant.

**Fraud: EVIDENCE:** *Plea and proof.* King worked for a railroad under *several* contracts and a settlement was arrived at, showing about $15,000.00 to be due. About $8,000.00, due on a contract for work in Iowa, was evidenced by drafts drawn on the company, and about $3,000.00 worth of subsidy notes were taken upon a contract for work in Missouri. King brought suit by verified petition, claiming that a balance of $15,000 was due, under a single contract, and that he was entitled to a mechanic's lien for all of it. Hubbard, an attorney representing a prior lien-holder, became aware of this suit and, deeming it for the interests of his client to obtain for him the King claim, he negotiated for, and obtained an absolute assignment of all claims held by King against the company, "as set out in petition." It is claimed that this assignment was obtained by fraud practiced upon King by Hubbard. It appears that Hubbard is a shrewd lawyer and King an ordinary business man; that Hubbard induced King not to call an attorney into the transaction, and that the assignment was procured for about $9,000.00; and H. gave K. a paper stating that the $6,000.00 in subsidy notes did not pass, and King claims that this was done to mislead him into thinking that his whole claim did not pass; and H. says that he did not know, at this time, that more than one claim existed. Hubbard saw said verified petitition, and after the assignment was obtained, answered it for the company, admitting its allegations, i. e., that the work of King was done *under a single contract.* It is conceded that Hubbard bought in order to get a mechanic's lien. Hubbard testifies as follows: King told him there was but one contract and that the subsidy notes were taken as part payment and not as collateral. Had said notes been taken as collateral it would have defeated a mechanic's lien    He told King he would not buy if the notes were taken as collateral. King testifies that he told Hubbard that the work was done under several contracts and that the subsidy notes were taken as collateral security to one of the contracts which

amounted to about $6,000.00, and that Hubbard expressly declined to buy the claim for Missouri work, and Hubbard denies most of this.

It appears that Hubbard did not understand that he was buying more than was evidenced by the drafts drawn upon the company. He did not think he was buying a claim for fifteen thousand dollars, but says that he was buying all that was due King. He wanted to buy such claims, only, as would base a mechanic's lien; and if the subsidy notes were taken as collateral, no lien existed except for about nine thousand dollars, or about the amount paid for the assignment. King says he did not want to sell the whole claim; wanted to sell that part only which was lienable, and that Hubbard did not want more of a claim than was lienable,—and it is plain that there may have been a mutual mistake. King retains what Hubbard paid him, and is seeking to recover of Hubbard's client, the six thousand dollars, which he claims did not pass by the assignment, on the ground that the client is liable for it as a stockholder of the railroad company. He pleads that the assignment conveys all of his claim through the fraud of Hubbard. *Held:*

a. A court of equity is always reluctant to rescind a contract on the ground of mistake, unless the parties can be put back *in statu quo*, and if that cannot be done, it will give such relief, only where the clearest and strongest equity imperatively demands it.

b. Equity cannot give affirmative relief by way of reformation, from a mistake of one of the parties to a contract, not induced by fraud or mistake of the other.

c. The burden of proof being on King, this evidence is not sufficient under these rules.

d. An assignment of a claim cannot be avoided by proof of mistake on the part of one or both of the parties, where the issue presented is the fraud of the assignee.

e. The agreement between Harding and King did not give Hubbard notice that King had claims, other than he intended to assign.

*Appeal from Polk District Court.*—HON. S. F. BALLIETT, Judge.

THURSDAY, OCTOBER 22, 1896.

ACTION at law to recover of defendant, a stockholder in the Des Moines, Osceola & Southern Railway Company, the amount of a judgment obtained by plaintiff against said company. The defense is a

general denial, and a plea that the judgment was obtained by fraud, for the reason that R. T. Wilson & Co. were the owners of the claim upon which the judgment was obtained; having purchased it, before the commencement of the action against the railway company, from one M. H. King, plaintiff's assignor. The defendant further pleaded that the stock transferred to him was never entered upon the books of the corporation, and that the stock issued to him was in excess of the amount which the corporation could legally issue, and that he was induced to take it through fraud and misrepresentation. The plaintiff, in reply, admitted the assignment by King of his claim against the corporation to Wilson & Co., but averred that the assignment was obtained through fraud. The case was tried to the court, resulting in a judgment and decree for plaintiff, and defendant appeals.—*Reversed.*

*N. M. Hubbard, Jr.*, and *F. F. Dawley* for appellant.

*Cummins & Wright* for appellee.

DEEMER, J.—This is the third appearance of this case in this court. The opinion on the first appeal will be found reported in 77 Iowa, 603 (42 N. W. Rep. 501); on the second, in 87 Iowa, 628 (54 N. W. Rep. 465). These appeals settled three questions: *First*, that the two papers which evidence the assignment of the claim from King to Wilson & Co., should be construed together, and that parol evidence was not admissible to vary, contradict, or explain these contracts, under the issues as they then stood; *second*, that the writings signed by the parties, on their face purported to be an absolute assignment to Wilson & Co., of all claims held by King against the railway company at the time the assignment was made; *third*, that

the pleadings, as they now stand, tendered an equitable issue, and that the case should be tried as in equity. In considering the case on this appeal, it is not necessary to set out the contracts of assignment between King and Wilson & Co., for they are copied in the opinion rendered on the first appeal, to which reference has been made. It is sufficient to say that it is conceded now that these papers, on their face, constituted an absolute assignment of all claims held by King against the railway company at the time it was made to Wilson & Co., and that the judgment which is sought to be collected in this case is fraudulent and void, unless the plaintiff in this case has shown that the assignment from King was obtained through fraud. This question then lies at the threshold of this controversy: Was this assignment procured by fraud? The negotiations leading to the assignment were conducted by N. M. Hubbard, Esq., representing Wilson & Co., with King; and, in all matters relating to the assignment, Hubbard was acting as the agent of the company. It appears from the evidence that King was a railway contractor, and that as such he built quite a part of the roadbed of the Des Moines, Osceola & Southern Railway Company. It is shown, as we think, by the evidence, that King had three separate contracts, personally, with the railway company, and that he was interested with a firm in another, of which he afterwards became the sole owner. His last contract was for the building of the road from the state line to the town of Cainesville, in the state of Missouri. After completing the work under his contracts, he had a settlement with the representatives of the railway company, in which it was found that the company owed him about fifteen thousand dollars, and that something over eight thousand dollars of this amount was for work done in Iowa, for which King

accepted orders of the treasurer of the railway company. It also appears that King held some subsidy notes which had been given the railway company, and which at the time of the assignment, were in the possession of the Des Moines National Bank, as collateral security for money borrowed from the bank by King, with which to prosecute his work. Whether these notes were held by King as collateral security, or whether he accepted them in payment for work done in Missouri, is one of the disputed questions of fact in the case. The following are the material parts of an agreement entered into between the parties at the time of this settlement: "Memorandum of agreement made and entered into this twenty-fourth day of December, 1884, by and between M. H. King, first party, and B. L. Harding, second party, of the city of Des Moines and state of Iowa, witnesseth: That whereas, the parties aforesaid have this day had a settlement of the matters and accounts of said M. H. King, arising out of the construction of what is known as the Cainesville Extension of the Des Moines, Osceola & Southern Railroad; and whereas, upon said settlement there was found to be due the said King, in full of all claims and demands arising under said contract, the sum of $8,614.12, *not otherwise provided for;* and whereas, in payment thereof said Harding has procured to be given, and said King has agreed to accept, accepted drafts upon the Des Moines, Osceola & Southern Railroad Company, all dated December 24th, 1884, and in amounts and due at dates as follows: * * * Total, $8,614.22. It is therefore understood, and agreed hereby, that in consideration of the settlement recited herein, and the acceptance given and received as above stated, if the said Des Moines, Osceola & Southern Railroad Company shall fail to pay said drafts as they become due and collectible, and default is made thereon, the said Harding will grant

for himself, and will procure from the said railroad company, a waiver of time, to the extent that the said King may, as a contractor, file his claim for a mechanic's lien against the said Cainesville Extension of the Des Moines, Osceola & Southern Railroad, for whatever amounts may at any given time remain unpaid, with the same effect as if the said lien were this day filed. And the said Harding hereby further undertakes and agrees that there are no parties or party now holding claims against said property for which mechanic's liens can be filed after this date, and for which claims for liens have not been heretofore filed, except it may be on account of contracts made by or through the said King, of which the said Harding has no knowledge. In testimony whereof, we have hereunto set our hands this twenty-fourth day of December, A. D., 1884. [Signed] M. H. King, B. L. Harding" (The above lines "not otherwise provided for" are interlined with a pen.) The railway company did not pay the drafts referred to in this contract, and King thereafter brought suit in the circuit court of Madison county to recover judgment for the amount of his claim or claims, and to establish a mechanic's lien therefor. In this suit he procured the appointment of a receiver, who took possession of the railway, and operated it for a short time. In his petition in that case he claimed that he performed the work and labor for the defendant during the years 1883 and 1884, under an oral contract for the construction of a part of defendant's road in Iowa and Missouri, amounting in the aggregate to the sum of thirty-three thousand, two hundred and thirty dollars and four cents, on which he had paid seventeen thousand, seven hundred and sixty-one dollars and fifty-three cents, leaving a balance due and unpaid of fifteen thousand four hundred and sixty-nine dollars and eleven cents for which sum he asked judgment and the

establishment of a mechanic's lien.   He attached to his petition an itemized statement of his account, which indicated but a single contract, or at best a mere running account with the railway company.   At this same time R. T. Wilson & Co. held a mechanic's lien for the sum of eighty thousand dollars against the railway company, which was prior in point of time to that held by King.   Hubbard, who represented Wilson & Co., as soon as he heard of the appointment of the receiver in King's case, concluded that it would be to the interest of his client to have a receiver apppointed by a federal court,—one who would have jurisdiction of the road both in Iowa and Missouri; and to accomplish this, and to save expense of litigation, the thought occurred to him that it would be well to purchase King's claim, and secure the control of his suit in Madison county.   Accordingly, he arranged, through a mutual friend, to meet King in the office of the *State Register*, at Des Moines. At this meeting the assignment was drawn which we have referred to, and at the same time Hubbard prepared an answer for Harding, a representative of the railway company, to sign.   This answer was taken by King to Harding, and Harding signed and verified it. It was as follows (after giving the title of the case, and naming the venue as in Madison county):   "It admits that M. H. King made a contract with the Des Moines, Osceola & Southern Railroad Company, as set forth in said amended petition, and admits that the work was done as alleged, and admits that there is now due plaintiff on said contract the sum of eight thousand eight hundred dollars ($8,800), and that plaintiff is entitled to judgment and a decree establishing a mechanic's lien for that amount.   Defendant also admits that a reasonable sum for services in establishing said lien is in the sum of five hundred dollars, and consents that that amount may be added to

judgment and decree for mechanic's lien, besides costs." The fraud, if any, which was perpetrated upon King, was at this meeting at the *Register* office, where these papers were obtained. After all these transactions had been had, King commenced suit in Clarke county, Iowa, against the railway company, and obtained the judgment upon which this suit is predicated, amounting to something over six thousand dollars. In his petition in that case he alleged a contract with the railway company for the building of the road from the state line to Cainesville, and attached to his petition a copy of the same exhibit which he had used in the Madison county suit, showing work and labor performed to the value and amount of thirty-three thousand two hundred and thirty dollars and sixty-four cents, a credit of seventeen thousand seven hundred and sixty-one dollars and fifty-three cents, a balance of fifteen thousand four hundred and sixty-nine dollars and eleven cents, and a further payment of nine thousand three hundred dollars, which was practically the amount Hubbard paid him at the meeting at the *Register* office, and he averred that these were all the sums which had been paid him for his work and labor.

Now, it is clear from what has been said, taken in connection with what was held in the opinion reported in 77 Iowa, 603 (42 N. W. Rep. —); that on the face of the papers, and without reference to the oral testimony adduced, plaintiff's judgment was obtained through fraud; for the reason that the claim upon which the judgment was rendered in the Clarke county district court, belonged to Wilson & Co., at the time the judgment was taken. And plaintiff must, in order to overcome the case thus made, and to avoid the effect of his assignment, show by clear, satisfactory, and conclusive evidence that the assignment on which defendant relies was obtained through fraud. It is not enough

to show mistake on the part of one or both of the parties—*First*, because this is not the issue presented; and, *second*, because if there was a mistake on the part of King, not induced by the fraud and misconduct of Hubbard, equity cannot give affirmative relief by way of reformation. Again, as said in the case of *Grymes v. Sanders*, 93 U. S. 55: "A court of equity is always reluctant to rescind, unless the parties can be put back *in statu quo*. If this cannot be done, it will give such relief, only, where the clearest and strongest equity imperatively demands it."

We now turn to the claim of fraud made by the plaintiff. This claim, in substance, is that the parties to the assignment did not meet on equal terms; that Hubbard was a shrewd and crafty lawyer, and that King was an ordinary business man; that Hubbard requested King not to inform his attorney of what was going on; that Hubbard did not wish to purchase any part of King's claim on which a mechanic's lien could not be established, and that he did not purchase more than this, i. e. the amount represented by the accepted drafts of the company; that the assignment passed to Wilson & Co. a claim they did not buy, to wit, the claim of six thousand dollars, for which the subsidy notes were given, either as collateral, as the plaintiff would have it, or in payment, as defendant claims; that the paper given by Hubbard to King, with reference to the subsidy notes, was intended to deceive King, and lead him to the belief that six thousand dollars of his claim was not being assigned. It is further claimed that, by reason of the situation of the parties, Hubbard owed King the utmost good faith, and that, if he unknowingly misrepresented the legal import of the papers, there was such mutual mistake as to relieve the parties, and that, if he knowingly misrepresented their effect, then

there was such mistake of King, coupled with such inequitable conduct on the part of Hubbard, as entitles plaintiff to a reformation of the assignment. King claims that he did not intend to transfer to Wilson & Co. any more of his account than was covered by the drafts. He says that he knew that he had no mechanic's lien for the work performed in Missouri, because he accepted the subsidy notes as collateral security on the contract for this extension. He further says that he told Hubbard about the condition of affairs, and that Hubbard said he did not desire to purchase any part of the claim for which a mechanic's lien could not be established. He further says that Hubbard expressly declined to purchase that part of the claim for work done in Missouri, but did promise him to assist in the collection of the subsidy notes, and to aid him in getting his money out of them. Most of these claims and statements Hubbard denies. He says that King told him that he (King) accepted the subsidy notes in payment for work done in the sister state, and that he knew nothing of there being separate contracts for different parts of the work. He further says that King first claimed that he received the notes as collateral, but that King afterwards admitted to him that he had received the subsidy notes as payment for so much work, and that he purchased the balance due King from the railway company, for which King was entitled to a lien. He distinctly and emphatically denies that King told him he had more than one contract, and he claims that he gave King the paper with reference to the subsidy notes in order to please him, and to assent to his demand for it. Turning now to the issues, we see that plaintiff claims that Hubbard did not intend to purchase the six thousand dollar claim, but that with intent to deceive and defraud, he induced King not to consult an attorney, and so drew the papers as that on their face he covered all the claims King had; that

Hubbard told King when the papers were drawn that they did not cover the six thousand dollar claim, and that, relying on Hubbard's statement, that he (King) was induced to sign the assignment. It is manifest that, in order to establish the fraud so pleaded, plaintiff must show that Hubbard knew when he drew the assignment that King had two claims, and that he drew it in the manner he did in order to deceive and defraud him. The only evidence we have to support the plea comes from King himself. In his testimony he says that he told Hubbard the exact situation, and that Hubbard said he would not purchase the six thousand dollar claim, because King had no lien therefor, but that he would see that King received the money on his subsidy notes. On the other hand, Hubbard expressly denies this conversation. He admits, however, that he was only seeking to buy that part of the claim for which a mechanic's lien might be established. He admits, or does not deny, that he told King not to consult his attorney, but he emphatically denies that he had any knowledge of more than one contract; and he further says that he told King he would not buy any part of the claim if the fact was that King had accepted the subsidy notes as collateral security, for the reason that, if this were true, King would have no right to a lien for any part of his claim. The controlling question of fact is a very close one, and it is not easy to determine which of these statements is the true one. The testimony of each of the witnesses is, from his standpoint, reasonable and consistent, and in accord with the nature of things. We are quite agreed that King had at least three separate contracts with the railway company. He could not establish a mechanic's lien for the amount of one of them, for the reason that, according to his present statement, he had accepted the subsidy notes as collateral security. Hubbard did not intend

to buy the claim, or any part of it, unless a mechanic's lien could be established therefor, and he did not understand he was buying more of an account than was represented by the drafts of the company. But these facts fall far short of establishing the fraud pleaded by plaintiff. In order to sustain this plea, it must be shown that Hubbard knew, when he drew the assignment of the six thousand dollar claim for constructing that part of the road lying in Missouri, that King held the subsidy notes as collateral security therefor. The only evidence we have tending to establish this notice is the testimony of King. Hubbard expressly denies this testimony, and if each witness were equally worthy of credit, as we must assume they are, plaintiff must fail, because the law wisely casts the burden upon him who affirms in such matters; and this burden is somewhat more heavy than in the ordinary case, because the parties have reduced to writing their contract, the effect of which is to be overcome. Bearing upon this question of Hubbard's knowledge, there are some other circumstances which tend to corroborate him. He had procured the petition filed by King in the Madison county district court, before the meeting at the *Register* office. This showed but one contract between King and the railway company. It was a verified petition, and had attached to it the exhibit to which we have heretofore called attention. This exhibit tended to show but one contract, or that King was claiming a lien for work and labor done on general account. It is true, it showed a balance due of something over fifteen thousand dollars. But, notwithstanding this, Hubbard was justified in believing, and no doubt did believe, when he met King, that there was but one contract; and that the balance due was on general account. Hubbard says that he first learned of the subsidy notes from an attorney of the company, who told him that the notes were given in

payment, and that when he met King at the newspaper office he immediately became solicitous to know whether these notes were accepted as collateral or in payment; that King first told him they were accepted as collateral, but afterwards admitted that they were taken in payment of so much of the claim. All this bears the impress of reason, for it is perfectly clear that no lawyer would have purchased the claim, intending to establish a mechanic's lien therefor, knowing at the same time that the claimant had accepted collateral security therefor. Moreover, it is perfectly clear that Hubbard, when he first met King, believed from the papers he had perused, and from the statements of the attorney for the railway company, that King had but one contract. It is claimed, however, that the memorandum of settlement made between King and Harding, and which it is admitted Hubbard saw before drawing the contracts of assignment, contained sufficient to notify Hubbard that King had other claims than the one he was intending to assign, or at least enough to put Hubbard upon inquiry. We do not think this is true, for the reason that this statement that the railway company owed King the sum of eight thousand, six hundred and fourteen dollars and twenty-two cents, "not otherwise provided for," is just as consistent with one theory as the other. The answer that Hubbard drew for Harding to sign, and to be filed in the Madison county case, clearly indicates that Hubbard understood at that time that there was but one contract; for it follows the allegations of the petition, and admits that all the work was done for the railway company, as alleged by King. These things all tend to corroborate Hubbard, to some extent, and it is manifest that he did nothing inconsistent with his present position. We believe, as we have said, that there was more than one contract between King and the railway company.

We believe, also, that Hubbard did not think he was buying a claim amounting to fifteen thousand dollars, and we are also convinced that King did not intend to sell Hubbard more of the claim than was represented by the accepted drafts; but this is far from sufficient to justify a finding of fraud in the transaction, or of mistake on the part of King, and in equitable conduct on the part of Hubbard, in procuring the assignment. It may be there was a mutual mistake, but this is not the claim made by the plaintiff. It is not improbable,—indeed, we are content to believe,—that there was a mistake made by King in agreeing to the assignment as it was written, but we are in much doubt as to whether Hubbard knew of this mistake. This doubt is so strong that, in applying to it the law in such matters, we are forced to conclude that plaintiff has failed to establish the fraud pleaded by him by that quantity of evidence required in such cases. If Hubbard, when he purchased the claim, believed that he was buying for his clients all that was due King, and paid his money on the strength thereof, as he says he did; if he thought that the subsidy notes taken by King were accepted in payment, and not as collateral security; if the defendant has acted and proceeded on the theory that King's claim was fully paid,—it would be manifest injustice for plaintiff s assignor to hold the money paid under this belief, and at the same time compel the defendant to pay more than six thousand dollars on a claim that he supposed he owned. Determined either way, this case will result in a hardship to the defeated party. But, as said in one of our early cases, involving the question of mistake, "the law wisely, though sometimes with great apparent hardship, leaves it for him to suffer who committed the mistake." It may be that, under proper issues, some way can be found to relieve the

parties on the ground of mistake as to the subject-matter, that is, by showing that there was no contract, because neither party understood the six thousand dollar claim was covered by the assignment. But such relief, even if it could be given (a point we do not decide), is quite different from the reformation of a contract to make it correspond with the real contract entered into between the parties. We think the plaintiff has failed to establish the fraud pleaded by him in his reply by such quantity of evidence as to justify the decree rendered by the district court.

Other questions discussed by counsel need not be considered, for the reason that the conclusion arrived at in the former part of this opinion, is decisive of the case.

We regret the necessity of being called upon to rebuke appellant's counsel for the strictures passed by them, in argument, upon opposing counsel and the learned district judge, who tried the cause in the court below. Such observations were entirely uncalled for, and are unworthy of counsel learned in the law and of wide experience at the bar. There is nothing in the record to justify the attack, and we hope their deep sense of the duties of counsel to each other, and the court below, as well as to this court, will prevent a repetition of such offensive remarks. The conclusion reached by us does not accord with the decree rendered in the court below, and the judgment is REVERSED.